UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James Bigham, John Quarnstrom, Robert Vranicar, Jim Bowman, Mike McCauley, and Matt Faribanks as Trustees of the Sheet Metal Local #10 Control Board Trust Fund, and the Sheet Metal Local #10 Control Board Trust Fund,<br><br>Plaintiffs,<br><br>v.<br><br>R & S Heating and Air Conditioning, Inc.,<br><br>Defendants. | Civil No. 14-1357 (DWF)<br><br><br><br><br><br>**MEMORANDUM,<br>OPINION AND ORDER** |

Christy E. Lawrie, Carl S. Wosmek, and Amy L. Court, McGrann Shea Carnival Straughn & Lamb, Chartered, 800 Nicollet Mall, Suite 2600, Minneapolis MN 55402 (for Plaintiffs); and

Matthew J. Schaap, Dougherty, Molenda, Solfest, Hills & Bauer P.A., 14985 Glazer Avenue, Suite 525, Apple Valley MN 55124 (for Respondents Agape Mechanical, LLC, and Philos Mechanical, LLC).

## BACKGROUND

On April 21, 2017, the Court found Defendant R & S Heating and Air Conditioning, Inc., ("R&S") in default and awarded judgment to Plaintiffs. (Doc. No. 87.) The Court found R&S owes the Sheet Metal Local #10 Control Board Trust Fund $1,282,875.40 in delinquent benefit contributions from November 1, 2012 through April 30, 2014. (*Id.* at 1.) Further, R&S owed the Control Board $283,536.18 in liquidated damages, $243,539.80 in unpaid interest, and $248,919.72 in attorney's fees

and costs. (*Id.* at 1–2.) In total, the Court entered judgment of $2,058,871.10 against R&S in favor of Plaintiffs. (*Id.* at 2; Doc. No. 88.) To date, R&S has not made any payments toward satisfaction of the judgment. (Decl. of Christy E. Lawrie ¶ 2, Doc. No. 99.)

In an attempt to collect on this judgment, Plaintiffs served discovery on R&S and deposed R&S's owner Brett Thielen. Plaintiffs then sought discovery from third-parties Philos Mechanical LLC ("Philos") and Agape Mechanical LLC ("Agape"), entities owned and controlled by Brett Thielen's brother, Scott Thielen.[1] Plaintiffs also served written discovery requests on the law firm that represented Philos and Agape: Doughtery, Molenda, Solfest, Hills & Bauer P.A. Through this discovery, Plaintiffs have learned the following.

Brett became the sole shareholder and officer of R&S on May 18, 2016. (Lawrie Decl. Ex. A at Int. 1.) Four days later, on May 22, 2016, R&S "sold 14 vehicles and 5 trailers to Philos" pursuant to an Asset Purchase Agreement. (Lawrie Decl. Ex. A at Int. 5, 10; Lawrie Decl. Ex. C.) Philos, which was formed the month prior in April 2016, is owed exclusively by Scott. (Lawrie Decl. Ex. A at Int. 5; Tr. 9: 11–24.) Philos bought the vehicles and trailers for $106,300. (Lawrie Decl. Ex. C at Art. 3.1.) Of that purchase price, $10,630 was paid immediately and $95,670 was paid via promissory note. (Lawrie Decl. Ex. C at Art. 3.1.) Philos was to make monthly payments from June 1, 2016 to June 1, 2021. (Lawrie Decl. Ex. C at Ex. A.)

---

[1]  To avoid confusion, the Court hereinafter refers to Brett Thielen as Brett and Scott Thielen as Scott.

The Asset Purchase Agreement included an express provision in which Brett contemporaneously entered into an Employment Agreement with Philos.  (Lawrie Decl. Ex. C at Arts. 7.5, 11.8, Ex. B.)  The Employment Agreement prohibited Brett from working for any entity competing with Philos.  (Lawrie Decl. Ex. F, Philos Dep. Tr. 30:10–36:8.)  Even though the Employment Agreement's terms indicated it was immediately effective, Brett asserts he has been employed by Philos since October 2016.  (Lawrie Decl. Ex. A at Int. 6.)

R&S was "performing work under license for Agape Mechanical in May 2016, but was unable to continue after the change in ownership.  Agape Mechanical completed the work . . . and billed R&S for its services."  (Lawrie Decl. Ex. A at Int. 4.)  Like Philos, Agape is also owned and controlled by Scott.  (Lawrie Decl. Ex. G, Agape Dep. Tr. 5:10-22.)  Agape's billing of R&S for services it claimed R&S could not complete continued into January 2017.  (Decl. of Matthew Schaap Ex. D, Doc. No. 105.)  But while R&S was supposedly unable to do any work for Agape, Philos subcontracted work to R&S and paid R&S $88,000 on July 15, 2016.  (Philos Dep. Tr. 53:16–64:1.)  R&S ceased operations in September 2016 and was "not aware of any period of time prior to that in which R&S was not able to meet payroll or contractual obligations."  (Lawrie Decl. Ex. A at Int. 3.)  Brett testified that R&S had no work in progress when it ceased operations—no open jobs, no monthly service contracts, no open bids.  (Lawrie Decl. Ex. I, Brett Thielen Dep. Tr. 98:18–99:4.)  As mentioned, Agape purportedly did work for R&S beyond the October 2016 cessation of operations, billing: $10,620 and $8,050

3

for work completed on October 3, 2016; $11,500 for work completed on January 5, 2017; and $19,800 for work completed on January 18, 2017.  (Schaap Decl. Ex. D.)

Agape obtained a judgment of $34,709.30 against R&S on October 14, 2016. (Lawrie Decl. Ex. A at Int. 4, 10; Lawrie Decl. Ex. D.)  Agape obtained another judgment against R&S on January 11, 2017 for $11,500.  (Lawrie Decl. Ex. D.)  Agape obtained yet another judgment against R&S on March 21, 2017 for $22,001.  (Lawrie Decl. Ex. D.)  Brett, acting on behalf of R&S, stipulated to each judgment.  (Lawrie Decl. Ex. E.)

Prior to the asset purchase, Scott knew—via Brett—R&S was going out of business.  (Philos Dep. Tr. 20:16–21:4, 44:14–47:11.)  Regardless, the Assent Purchase Agreement called for monthly payments for five years, from 2016 through 2021.  And, as noted, Agape received stipulated judgments against R&S.  Then, Agape garnished Philos's payments to R&S under the Asset Purchase Agreement to satisfy those stipulated judgments.  (Lawrie Decl. Ex. A at Int. 10.)  Specifically, in reference to the March 21, 2017 stipulated judgment, Attorney William Topka emailed Scott on March 17, 2017, stating:  "You and Brett haven't had a chance to come in and sign the new agreement.  If you want to keep beating the union to the punch, the sooner the better!"  (Lawrie Decl. Ex. L.)  Philos still owes approximately $65,000 in principal on the note.  (Lawrie Decl. Ex. A at Int. 10.)

Plaintiffs now move to compel as to several discovery requests deemed insufficient.  Plaintiffs also challenge the assertion of the attorney-client privilege and work-product doctrine as to certain withheld discovery.

4

## DISCUSSION

"The right to conduct discovery applies both before and after judgment." *Credit Lyonnais, S.A., v. SGC Int'l, Inc.*, 160 F.3d 428, 430 (8th Cir. 1998). A judgment creditor "may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2); *see States Res. Corp. v. Younger*, 2014 WL 912369, at *2 (W.D. Mo. Mar. 10, 2014) ("By its terms [Rule 69(a)(2)] offers a judgment creditor the option of utilizing federal law or state law as it relates to post-judgment discovery."). Under the federal rules, then, Plaintiffs have "a right to conduct reasonable post-judgment discovery and to inquire into [R&S's] assets." *Credit Lyonnais, S.A.*, 160 F.3d at 430.

Like in *Credit Lyonnais*, Plaintiffs here have "presented evidence depicting the close relationship[s]" between R&S, R&S's sole owner Brett, Philos, Agape, and Philos and Agape's sole owner Scott. *Id.* at 430. Through a series of transactions and garnishments, R&S transferred its assets to Philos and Agape to render itself insolvent to repeatedly "beat the union to the punch." The absurdity of the situation is evidenced by the admission that Scott and Brett knew R&S was going under but nonetheless structured a transaction to pay a defunct entity in monthly payments for *five years*. Those monthly payments were then conveniently garnished at the perfect time, resulting in a Scott Thielen company taking money earmarked for a Brett Thielen company paid by a Scott Thielen company. In the end, Scott ends up with R&S's assets without having to pay nary a penny for them; Scott paid Scott to get Brett's stuff. Under this specter of less-than-arm-length transactions, Plaintiffs are absolutely entitled to conduct discovery in

5

their attempt to trace the assets of R&S as they nominally passed into control of the Agape/Philos/Scott blended sphere.  *Id.* at 431 ("The relationship between Sedelmayer and SGC 'is sufficient to raise a reasonable doubt about the bona fides of [any] transfer of assets between them.'") (quoting *Magnaleasing, Inc. v. Staten Island Mall*, 76 F.R.D. 559, 562 (S.D.N.Y. 1977)).  Because discovery attempting to trace where R&S's assets went is warranted, the Court now turns to the validity of the objections to Plaintiffs' discovery requests.[2]

The attorney-client privilege protects communications between attorneys and their clients.  The privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) (citing *Trammel v. United States*, 445 U.S. 40, 51 (1980)).  But the privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."  *Upjohn Co.*, 449 U.S. at 395.

---

[2]  The specific discovery requests at issue are:

(5)  All correspondence, notes, and documents related to or referencing the May 22, 2016 asset purchase agreement between [R&S] and [Philos].

(6)  All correspondence, notes, and documents related to the valuation of the assets purchased by [Philos] from [R&S].

(7)  All correspondence and documents related to any creditor's collection efforts for [R&S's] debts from January 1, 2016 to the present.

(8)  All notes regarding correspondence with Brett Thielen, any representative or agent of Brett Thielen, [R&S], or its representative or agent, from January 1, 2016 to the present.

6

"The work product privilege is designed to promote the operation of the adversary system by ensuring that a party cannot obtain materials that his opponent has prepared in anticipation of litigation." *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997). The work-product doctrine allows for discovery of "ordinary work product" upon a showing of "substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977). "Opinion work product," consisting of mental impressions, conclusions, opinions, or legal theories regarding the litigation, enjoys "a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances" *Id.*; *Pittman*, 129 F.3d at 988.

Understandably given the intermingling of R&S, Philos, Agape, Brett, and Scott, there is confusion as to which attorney represented which client. To appreciate whether the assertion of the attorney-client privilege and work-product doctrine here is appropriate, the Court must untangle this bed of weeds.

Attorney Paul Haik represented R&S as bankruptcy court-appointed special litigation counsel. (Decl. of Paul Haik ¶ 6, Doc. No. 104.) Haik was appointed in 2010 and completed his duties on September 30, 2011. (*Id.*) Haik again represented R&S in a breach of contract dispute regarding a project in North Dakota. (*Id.* ¶ 7.) Haik states no actions were commenced related to that representation and his work terminated in November 2015. (*Id.*)

Haik was then retained by Agape on October 25, 2016. (*Id.* ¶ 8.) At some point, Haik began representing Philos as well. (*Id.* ¶ 10.) Haik objected to the subpoenas

7

Plaintiffs served on Agape and Philos, then "turn[ed] the matter over to Agape's other attorney, William M. Topka." (*Id.* ¶ 11.) On October 12, 2018, Haik received a doctor's note indicating Brett should not undergo any "further legal proceedings" due to heart surgeries more than three years prior. (Lawrie Decl. Ex. H.) Haik forwarded this note to Plaintiffs' counsel with respect to a different construction arbitration where Brett was to testify as an employee of Philos and Haik was representing Philos. (Haik Decl. ¶ 12.) Haik declares he has never represented Brett. (*Id.* ¶ 5.)

The law firm of Doughtery, Molenda, Solfest, Hills & Bauer P.A. represents Agape and Philos. William Topka was an attorney with that firm while representing Agape and Philos but is no longer with the law firm. There is no allegation or evidence that Haik ever was an attorney at Doughtery, Molenda, Solfest, Hills & Bauer P.A. Based on the record before the Court, Agape and Philos were represented by Haik and Topka, lawyers at two separate law firms. The Court cannot conclude, however, that Haik conclusively stopped his on-and-off-again representation of Brett while he also represented Agape and Philos. Nor can the Court conclude that the law firm of Doughtery, Molenda, Solfest, Hills & Bauer P.A., via Topka, never represented Brett in some fashion because the evidence shows that Topka was drafting the agreements that Brett was using to "beat the union to the punch." This denotes a coordination incompatible for parties that owed each other non-trivial sums of money. Where the

parties and the lawyers blur the boundaries of the attorney-client relationship to use it as a sword, they cannot later assert the sanctity of that relationship as a shield.[3]

Given this purported co-representation by Haik and Topka of Philos and Agape, certain documents have been withheld under assertions of the work-product doctrine and attorney-client privilege. (Lawrie Decl. Ex. N.) In response to Plaintiffs' Motion, Respondents provided an updated privilege log. (Schaap Decl. Ex. A.). A "Draft Bill of Sale" from May 19, 2016 and "Draft Resolution for Purchase Agreement" from May 23, 2016; have all been withhold under the work-product doctrine, (Lawrie Decl. Ex. N), and a later-asserted attorney-client privilege, (Schaap Decl. Ex. A.) There is no author indicated for these documents. (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.) "Attorney Notes of Brett Thielen Deposition" from August 13, 2019 are being withheld on the assertion of the work-product doctrine. (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.) This document has no author identified. (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.)

Outside of these three entries on the privilege logs, 37 emails have been withheld. (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.) The privilege log provides the author, the recipient(s), and the date and time, but it provides no description better than "email." (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.) The emails are mostly withheld under the

---

[3] There exists a crime-fraud exception to the attorney-client privilege wherein "communications in furtherance of future illegal conduct" are not protected. *United States v. Zolin*, 491 U.S. 554, 556 (1989). A court may conduct an *in camera* review of materials to determine whether they fall within the ambit of the crime-fraud exception given a good faith belief that the exception applies. *Id.* at 574–75. Plaintiffs have not advanced this exception to the attorney-client privilege, so the Court does not rely upon it to conduct the *in camera* review ordered herein and the Court makes no decision as to its applicability.

attorney-client privilege, but some are also withheld pursuant to a secondary assertion of the work-product doctrine.  (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.)  The emails are between various iterations of Philos/Agape personnel—Scott and Kyle Thompson—and attorneys Topka and Haik, or sometimes just between Haik and Topka.  (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.)  The emails come in batches:  August 30, 2018; November 15 to 28, 2018; and July 3 to 24, 2019.  (Lawrie Decl. Ex. N; Schaap Decl. Ex. A.)

Regardless of the validity of the assertion of the attorney-client privilege or the work-product doctrine, the privilege log provided here is inadequate under the Federal Rules of Civil Procedure.  When a party withholds information pursuant to either the attorney-client privilege or the work-product doctrine, it must produce a privilege log that "describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).  Based on the privilege log here, neither Plaintiffs nor the Court can assess the claim of attorney-client privilege or work-product doctrine.  This inability to assess such assertions of privilege is further hindered by the already murky boundaries between the parties and attorneys themselves.  Indeed, there is no indication whatsoever in the privilege log whether the documents withheld refer to Haik and Topka's representation of Agape, Philos, or both.  While the Court will assume Haik represented Agape and Philos alongside Topka, Agape and Philos are still two separate entities and these lawyers have professional obligations to each client to the fullest.  Haik and Topka

should not have succumbed to the sloppy intermixing of corporate entities in the same way as the company's owner because doing so threatens the ability of their clients to now assert the attorney-client privilege. Accordingly, the Court will review the emails *in camera* to assess applicability of the attorney-client privilege.

The same inadequacies also apply to the draft bill of sale, the draft resolution for purchase agreement, and the notes for the Brett Thielen deposition. The privilege log contains no details as to the authors of the documents nor sufficient information to understand the assertion of privilege as required by Rule 26(b)(5)(A)(ii). As such, the Court could likewise deem such assertions of privilege waived due to the inadequacy of the privilege log and require the documents be turned over.[4] But given the importance of the attorney-client privilege and work-product doctrine, the Court will entertain Respondents' reasoning as found in their briefing.

Respondents assert that Topka drafted the purchase agreements between Philos and R&S. (Schaap Decl. ¶ 3.) The purchase agreement, Respondents assert, was drafted in anticipation of potential litigation due to R&S's potential insolvency. (Schaap Decl. ¶ 4.) Thus, Respondents have withheld the draft versions of this agreement under the work-product doctrine. Respondents also assert that the draft agreements have attorney commentary in them. The Court concludes this is an improper invocation of the work-product doctrine and attorney-client privilege.

---

[4] While Respondents' privilege log is inadequate to understand what the notes for the Brett Thielen deposition entails, Plaintiffs make no argument as to this document in their briefing, so the Court will not compel production.

11

"Preliminary drafts of contracts are generally protected by attorney-client privilege, since they may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege." *Upsher-Smith Lab., Inc. v. Mylan Lab., Inc.*, 944 F. Supp. 1411, 1445 (D. Minn. 1996) (cleaned up, quotation omitted). But this privilege can be waived by disclosure to a third-party. *Id.* (citing *United States v. Cote*, 456 F.2d 142, 144–45 (8th Cir. 1972)). Here, both Brett and Scott testified that all negotiations of the Asset Purchase Agreement, including the appraisals, and the contemporaneous Employment Agreement went through their attorneys. (Brett Thielen Dep. Tr. 52:23–54:16, 61:12–62:8, 93:8–12; Philos Dep. Tr. 19:21–20:15, 21:15–24:9, 37:23–39:20, 82:6–9.) Indeed, Brett testified that "the only discussions I've had with my brother is through my attorney." (Brett Thielen Dep. Tr. 93:8–12.) Even though disclosure of the draft agreements happened between attorneys, these attorneys were representing adverse parties. The draft agreements were exposed to third parties through the negotiation process. As such, they are not protected by the attorney-client privilege and must be disclosed.

To determine the applicability of the work-product doctrine, the Court must determine if the documents withheld under this doctrine were prepared in anticipation of litigation. Courts look at

> whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

*Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (quotation omitted). Respondents' arguments are self-defeating. If, as Respondents argue, the Asset Purchase Agreement is an arms-length business transaction in which Philos paid fair market value to R&S, then these documents were prepared in the ordinary course of business and are not shielded by the work-product doctrine.

      Respondents attempt to stretch the definition of "anticipation of litigation" too far. Just because R&S was involved in litigation does not mean any transaction with R&S would precipitate litigation. Taken to its extreme, Respondents' argument would mean that the work-product doctrine would shield every sales contract between one entity and another if one of those entities had any pending or contemplated lawsuits. There was no litigation between Philos and Plaintiffs and there was no litigation between Philos and R&S. The only litigating parties here were (1) Plaintiffs and R&S and (2) Agape and R&S because of the judgments. Even now, there is no litigation between Plaintiffs and Respondents; this remains a lawsuit between Plaintiffs and R&S. Just because Respondents are submitted to third-party discovery does not mean they are "in litigation" with Plaintiffs, no matter the amount of motion practice engaged in. Simply put, the Asset Purchase Agreement and its drafts cannot be said to have been prepared or obtained *because of* litigation, merely under the grey cloud of ongoing tangential litigation.

      Based on the inadequate privilege log, the record of intermingled corporate identities and inter-dealings between the entities, and the unclear understanding of the roles Haik and Topka played, the Court orders an *in camera* review of all documents withheld under the ambit of the attorney-client privilege and the work-product doctrine

except for the notes for the Brett Thielen deposition.  To accomplish this *in camera* review most effectively, the Court implements the following process.  First, Respondents must review the discovery withheld under the attorney-client privilege and the work-product doctrine within 10 days of this Order to determine if, in accordance with this Order, any privilege assertions should be withdrawn.  Within 10 days of this Order, Respondents must submit to the Court an updated privilege log and the documents it has withheld pursuant to the attorney-client privilege and the work-product doctrine.  This submission shall be filed on the docket *ex parte*.  The Court will then conduct a prompt review and issue a summary order as to whether any of the documents must be produced.

Plaintiffs also seek to re-depose Philos and Agape.  Fed. R. Civ. P. 30(a)(2)(A)(ii) (requiring leave of court for repeated deposition).  As evidenced above, the Court has reviewed in full the deposition transcripts of Brett, Philos, and Agape.  Their obstructionist natures speak for themselves.  When Scott was deposed as a representative of Philos, the following set the tenor of the whole ordeal:

> Lawrie: When you started [Philos] in early 2016, what assets did the company have?
> Topka: Objection to relevancy.
> [Scott]: Yeah.  It's proprietary information.  You don't have any – you're trying to collect a debt for R&S, not come after Philos unless that's what you're doing.  So, I'm not going to answer that, and that's the truth.
> Lawrie: I'm going to object to your answer as being nonresponsive.  And I'll ask you again, what assets did the company have at its formation?
> Topka: Objection, asked and answered.  He's already given you his answer.
> Lawrie: He didn't answer the question.
> Topka: He gave you his answer.  He told you he's not going to answer the question.

| | |
|---|---|
| Lawire: | Are you instructing your witness not to answer? |
| Topka: | Did I instruct him not to answer? He's answered your question. He said he's not going to answer it. I'm not instructing him to do anything. He's given you his testimony. |
| Lawrie: | What was Philos's business plan when you started in mid 20 – |
| Scott: | It's proprietary. I'm not going to answer anything about the aspects of Philos's business, their customers or anything of that nature. If you want to ask the relationship with R&S Heating, I'll be glad to answer. |

(Philos Dep. Tr. 10:20–12:1.) The objections and refusals to discuss anything about Philos became so numerous that the parties agreed Plaintiffs would have a standing objection to Scott's refusal to answer such questions. (Philos Dep. Tr. 49:1–7.) Scott, as Philos's representative, refused to answer any questions about the company's assets, (Philos Dep. Tr. 10:20–12:1), business plan, (Philos Dep. Tr. 11:20–12:1, 13:8–16), formation, (Philos Dep. Tr. 13:20–14:24), employees, (Philos Dep. Tr. 18:3–15, 47:12–48:17), or customers, (Philos Dep. Tr. 48:18–49:17, 53:10–15, 87:13–88:7). These are all topics well within the ambit of Plaintiffs' discovery requests and permissible topics of exploration. This behavior continued into the Agape deposition, which directly followed the Philos deposition.

Topka, while disclaiming that he was instructing his client not to answer, encouraged Scott to not answer questions. Objections to questions may be noted on the record, but the examination still proceeds notwithstanding the objection. Fed. R. Civ. P. 30(c)(2). "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." *Id.* The refusal to answer any questions about Philos's assets,

business plan, formation, employees, or customers had no relation to an assertion of privilege or any other basis for refusal to answer under Rule 30(c)(2). Rather, it was based on Scott's supposed distrust of unions. As such, refusal to answer was improper.

Additional time is needed for Plaintiffs to conduct fair examinations of Philos and Agape. Each deposition presented circumstances that impeded the examination. The Court authorizes 6 hours of additional deposition time for each of Philos and Agape. The Court reminds Philos and Agape that the discovery sought has been deemed permissible and deponents can only refuse to answer questions in extremely limited circumstances. Further, the Court notes that failure to comply with this Order may be treated as contempt of court under Rule 37.

## CONCLUSION

Based upon the record before the Court, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel (Doc. No. [96]) is **GRANTED** as discussed herein.

Dated: November 17, 2020
              s/Donovan W. Frank
              DONOVAN W. FRANK
              United States District Judge